IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KATHERINE FIGUEROA, o/b/o, | ) | |
| E.A.R.F, a minor child, | ) | CASE NO. 1:20-CV-1765 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Katherine Figueroa ("Plaintiff" or "Ms. Figueroa") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") on behalf of her minor child, E.A.R.F. (ECF Doc. 16, p. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED** for further proceedings consistent with this Report and Recommendation.  On remand, the ALJ should provide a full and accurate explanation of the evidence that forms the basis for the ALJ's findings regarding: (1) whether the elements of Listing 112.11(A) have been met; (2) the level of limitation in each of the four functional categories set forth in Listing 112.11(B); and (3) the level of limitation in each of the six functional categories required to functionally equal the listings under 20 C.F.R. § 416.926a.

## I.  Procedural History

On May 4, 2017, Ms. Figueroa protectively filed an application for children's SSI on behalf of her child E.A.R.F.  (Tr. 183-8.)  Ms. Figueroa alleged a disability onset date of February 1, 2017.  (Tr. 183.)  She alleged E.A.R.F. was disabled due to speech issues, hand issues, and ADHD.  (Tr. 235.)  Ms. Figueroa's application on behalf of E.A.R.F. was denied at the initial level (Tr. 91-95) and upon reconsideration (Tr. 99-104), and she requested a hearing (Tr. 105-07).  On May 1, 2019, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 43-63.)

On June 28, 2019, the ALJ issued a decision finding that E.A.R.F. had not been under a disability within the meaning of the Social Security Act from April 19, 2017, through the date of the decision.  (Tr. 15-42.)  On June 8, 2020, the Appeals Council denied Ms. Figueroa's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-8.)

## II. Evidence

**1.      Personal Evidence**

E.A.R.F. was born in 2012.  (Tr. 183.)  Under Social Security regulations, he was a preschooler at the time the application was filed, and a school-aged child at the time of the ALJ's decision.  (Tr. 24.)

**2.      Medical and Educational Evidence**

### 1.  Treatment History

On December 14, 2016, Ms. Figueroa sent a letter to the principal of Thomas Jefferson Elementary School, where E.A.R.F. attended preschool, requesting a Multifactor Evaluation of E.A.R.F. to see if he needed special education services.  (Tr. 459.)  Ms. Figueroa noted her son was having difficulty with speech/language and impulsivity.  (*Id.*)  On the same day, Lisa

Ramirez Shah, Ph.D., a clinical psychologist at MetroHealth who was treating E.A.R.F., also wrote a letter for Ms. Figueroa to share with the principal, stating her belief that E.A.R.F. has a language disability and impulsivity, and may need special education services.  (Tr. 460.)  Dr. Shah noted she had tested E.A.R.F. for autism, and determined his symptoms were not consistent with that diagnosis, but were reflective of a significant language delay.  (*Id*.)

Clinical social worker Deborah Casciato, MSSA, LISW-S, completed a mental health assessment of E.A.R.F. on September 19, 2016, with the help of a Spanish interpreter.  (Tr. 492.) Ms. Figueroa described E.A.R.F. as being violent, very aggressive, hitting himself, constantly moving, unable to sit still, jumping on tables, covering his ears in response to noises such as loud voices or music, ignoring people who talk to him, and spending most of the day alone in his bedroom.  (Tr. 493.)  She reported that he pulled the fire alarm at school, and his preschool day was shortened to a half day due to his behavior problems.  (*Id*.)  She stated the school told her they would kick him out of school if his behavior does not improve.  (*Id*.)  Ms. Casciato diagnosed E.A.R.F. with adjustment disorder with mixed disturbance emotions and conduct, and recommended further mental health assessment at the MetroHealth autism clinic, and referred E.A.R.F. to MetroHealth clinical social worker Beth Bacon, LCSW -S.  (*Id*.)

On November 4, 2016, Ms. Figueroa came to MetroHealth for a parent-only intake appointment at the autism clinic.  (Tr. 469.)  The assessment was scheduled to take 90 minutes, but after 20 minutes, Ms. Figueroa informed Ms. Bacon that she had another appointment and needed to leave.  (*Id*.)  She rescheduled the remainder of the evaluation for the following week. (*Id*.)  On November 10, 2016, Ms. Figueroa and E.A.R.F. returned to MetroHealth to complete the autism clinic intake process with Ms. Bacon.  (Tr. 465.)  Ms. Figueroa explained the Cleveland Schools had asked her to get this assessment because of E.A.R.F.'s behavior in

school.  (*Id*.)  She reported that E.A.R.F. was hyperactive, she couldn't understand most of the words he spoke, and he would get frustrated when his speech was not understood.  (*Id*.)  She reported no self-injurious behavior, and reported that E.A.R.F. "gets excited when he sees other children and will play with them."  (Tr. 466.)  Ms. Bacon's impression, "[b]ased on limited parental input," was that "the child appears to have behavioral problems and developmental problems."  (Tr. 468.)  Ms. Bacon diagnosed adjustment disorder with mixed disturbance of emotions and conduct, noted a parent assessment needed to be completed, and referred E.A.R.F. to Dr. Ramirez Shah for an autism assessment.  (*Id*.)

MetroHealth psychologist Lisa Ramirez Shah, Ph.D., completed an autism assessment of E.A.R.F., and reviewed the results with Ms. Figueroa on December 14, 2016.  (Tr. 512.)  Dr. Shah diagnosed an expressive language delay, and recommended requesting further evaluation by the school to determine E.A.R.F.'s level of cognitive functioning.  (Tr. 512-13.)

On March 23, 2017, the Cleveland Municipal School District and Ms. Figueroa adopted an Individualized Education Program ("IEP") for E.A.R.F.  (Tr. 551-55.)  The IEP noted that E.A.R.F. had limited English proficiency and had communication needs.  (Tr. 552.)  It discussed interventions which had been provided prior to implementing the IEP, noting that E.A.R.F. began receiving Student Support Team services in December 2016, and initially had interventions including rewards and a school day of only two hours, which was lengthened to a half day and eventually extended to the entire day as he adjusted to the school routine.  (*Id*.)  At a January 2017 Student Support Team meeting, E.A.R.F.'s teacher reported his behavior was improving.  (*Id*.)  The IEP noted that testing by the school's occupation therapist ("OT"), who was assisted by a bi-lingual paraprofessional, showed E.A.R.F. did not consistently demonstrate one-hand dominance, and required assistance with managing fasteners, dressing, bathing,

4

grooming and toilet hygiene.  (Tr. 553.)  The OT also noted he demonstrated a shorter attention

span for seated, focused tasks that he was not engaged in, and had difficulty maintaining himself

in a structured position, such as circle time on a rug or at a table, for more than one to five

minutes.  (*Id*.)  The OT observed "[h]e prefers constant movement and large motor activities,"

and recommended E.A.R.F. receive occupational therapy.  (*Id*.)  A communication assessment

noted age-inappropriate substitutions of k and g sounds, and concluded "his behavior, attention,

and decreased ability to use sentences and intelligible speech have a negative impact on his

ability to communicate in class."  (*Id*.)  The IEP noted his academic progress was also impeded

by chronic absences, as he had missed 23 days of school that year.  (Tr. 555.)  He was able to

identify colors, but did not know the alphabet and could not count or identify shapes in either

Spanish or English.  (Tr. 560.)  He received special education services from an intervention

specialist, speech and language pathologist, and occupational therapist.  (Tr. 562-63.)

On August 3, 2017, E.A.R.F. underwent a mental health assessment at Applewood

Centers, which offered school-based behavioral health counseling.  (Tr. 599.)  Ms. Figueroa

reported E.A.R.F. was unable to verbalize his needs and preferences due to inattention and a

speech impediment, and was hyperactive, impulsive, and defiant.  (*Id*.)  She also reported he

fought, had conflicts with his sister, needed constant reminders to do things, climbed out a

ground floor window while pretending to be Spiderman, hit his own face when angry, had

tantrums and angry outbursts at school and at home, and had daily euresis.  (*Id*.)  Clinical social

worker Gamalier Felicie, MS, MSW-LSW, noted reports of difficulty making and sustaining

friendships and poor social skills, with average intelligence, poor concentration, and memory

problems.  (Tr. 601.)  Based on reports from the school, she noted he was unable to read, had

difficulty writing, and was working below his ability level.  (Tr. 602.)  Ms. Felicie recommended

weekly behavioral health services, as well as community psychiatric support and treatment services two or three times a month, and referred E.A.R.F. for psychiatric services to assess for ADHD treatment.  (Tr. 606.)  Ms. Figueroa declined further services.  (Tr. 607.)

A psychiatric diagnostic interview was performed by Certified Nurse Practitioner Leslie Thomas at Applewood Centers on October 13, 2017, assisted by a Spanish interpreter.  (Tr. 615.) Nurse Thomas noted that both E.A.R.F.'s teacher and his mother had endorsed eight out of nine inattentive ADHD symptoms and all nine hyperactive ADHD symptoms.  (Tr. 615.)  Ms. Figueroa reported E.A.R.F. had no enuresis, and walked and potty trained on time.  (Tr. 616.) She reported he had no neighborhood friends, but was able to make and sustain friendships at school.  (*Id.*)  On examination, E.A.R.F. was appropriately dressed, showed decreased impulse control and frustration tolerance, impaired judgment, reduced eye contact, hyperactivity, unremarkable thought content and perceptions, impaired concentration and ability to focus, happy/euthymic mood, and had school performance below his norm or potential.  (Tr. 617.) E.A.R.F. was diagnosed with ADHD, and began treatment with Ritalin.  (Tr. 617-618.)

E.A.R.F. followed up at Applewood Centers on October 26, 2017.  (Tr. 612.)  As with most treatment visits at Applewood, a Spanish interpreter was present.  (*Id.*)  Nurse Thomas noted he had begun treatment with twice-daily Ritalin, before and after school.  (Tr. 612-14.) Ms. Figueroa reported the medication calmed E.A.R.F. for half an hour, and then had no effect. (Tr. 612.)  Nurse Thomas increased his dosage of Ritalin.  (Tr. 614.)

At a psychiatric follow up appointment on December 4, 2017, Nurse Thomas noted that E.A.R.F.'s school reported his attention at school had improved, but that he had increased aggression at home with his mother.  (Tr. 651.)  Nurse Thomas noted he was unsure if he was behaving at school due to communication issues, but E.A.R.F. reported getting greens on his

behavior chart.  (*Id*.)  Mental status examination findings were unchanged.  (Tr. 652.)  Nurse

Thomas discontinued the Ritalin due to increased aggression, and recommended E.A.R.F. return

in two weeks.  (Tr. 653.)

      At E.A.R.F.'s next psychiatric appointment on January 4, 2018, Nurse Thomas noted

E.A.R.F. had begun treatment with Adderall, but reported the new medication worked for only

one or two hours before symptoms returned.  (Tr. 654.)  Ms. Figueroa also reported increased

aggression and hitting when E.A.R.F. was with her and his siblings at home, and that the

melatonin he had been taking for sleep issues was no longer working.  (*Id*.)  Nurse Thomas

discontinued Adderall, started treatment with Intuniv at 1 mg per day for ADHD, and continued

melatonin for sleep issues.  (Tr. 657.)  At a follow up psychiatric appointment on February 1,

2018, Ms. Figueroa reported she was pleased with E.A.R.F.'s progress on Intuniv, and he was

sleeping well.  (Tr. 658.)  Notes for this visit are limited, and indicate an interpreter was not

available.  (*Id.*)

      The following month, on March 5, 2018, Nurse Thomas noted E.A.R.F. was "doing

better in school," but had increased hyperactivity after school ended and was scared that his toys

were looking at him at night.  (Tr. 660.)  On examination, Nurse Thomas noted E.A.R.F. had

appropriate attire, was soft spoken, with normal thought processes, an adequate fund of

knowledge for his age, and happy/euthymic mood.  (Tr. 661-62.)  Nurse Thomas increased his

dosage of Intuniv to 2 mg per day.  (Tr. 663.)

      At his next psychiatric appointment, on April 3, 2018, Nurse Thomas noted that the

Intuniv dosage had not been increased after the March appointment, and raised it to 2 mg per

day.  (Tr. 664.)  He noted Ms. Figueroa was supportive of the increase, reporting Intuniv

"doesn't work as well as it initially did," and that E.A.R.F. was again showing hyper and

aggressive impulsive behavior.  *(Id.)*  She reported that "[a]cademically he continues to make good progress," and sleeps well with melatonin each night.  (*Id*.)

At his next psychiatric appointment on May 15, 2018, Ms. Figueroa reported E.A.R.F. was "doing better" after the medication increase, but had hyper and aggressive impulsive behavior for the past three days because he ran out of medication.  (Tr. 666.)  Nurse Thomas noted E.A.R.F. continued to make progress academically, and would move to first grade.  (*Id*.)

However, when E.A.R.F. next saw Nurse Thomas for psychiatric follow-up on July 9, 2018, Ms. Figueroa reported his medications were no longer working.  (Tr. 668.)  She reported the Intuniv seemed to wear off, and that E.A.R.F. was throwing things, yelling, and slamming doors.  *(Id.)*  She also reported sleep issues in that the melatonin still helped him fall asleep, but he would wake after about three hours, then play for about two hours before falling back asleep. (*Id*.)  His mood was good overall, but he had rapid mood swings with agitation, cried easily and was easily frustrated.  (*Id*.)  On examination, Nurse Thomas noted E.A.R.F. had appropriate attire, was soft spoken, with normal thought processes, an adequate fund of knowledge for his age, and happy/euthymic mood.  (Tr. 670.)  He increased the dosage of Intuniv to 3 mg per day, increased the melatonin dosage, and recommended E.A.R.F. follow up in one month, or sooner if his symptoms worsened.  (Tr. 672.)

E.A.R.F. returned to Nurse Thomas one month later, on August 10, 2018.  Ms. Figueroa reported he was taking his medication as ordered, his moods and behaviors had improved, and he was sleeping well.  (Tr. 673.)  Examination findings were unchanged.  (Tr. 675.)  At his next psychiatric care visit, on October 2, 2018, Ms. Figueroa reported no concerns. (Tr. 678.) Examination findings were unchanged.  (Tr. 679-80.)  Nurse Thomas recommended E.A.R.F. follow up in three months or sooner if symptoms worsened.  (Tr. 681.)

Applewood Centers provider Stephanie Flynn, CT performed a psychiatric evaluation of E.A.R.F. on January 8, 2019, co-signed by supervisor Robin Leichtman, Ph.D., LPCC.  (Tr. 687, 694.)  She indicated that E.A.R.F. started taking medication for ADHD one year previously, but that Ms. Figueroa reported the medication was no longer helping him and she wished to "see psychiatry to address the issue."  (*Id*.)  Ms. Figueroa also reported E.A.R.F. had issues with food, and would vomit food he didn't like.  (*Id*.)  On examination, Ms. Flynn noted E.A.R.F. had unremarkable appearance, thought content, thought process, intellectual functioning, and general functioning.  (Tr. 690-91.)  However, Ms. Flynn also observed E.A.R.F. did not focus on any single activity, played with all the toys and would constantly want the toy his brother had, had blunted affect, and did not show facial expression even when asked specific questions.  (Tr. 691.)  Ms. Figueroa reported he still had problems with wetting the bed, could not read, and struggled with writing.  (*Id*.)  Ms. Flynn assessed a sibling relationship problem and an academic or educational problem, recommended individual psychotherapy services with family involvement two or three times a month, and referred E.A.R.F. to a nutritionist.  (Tr. 692.)

E.A.R.F. returned to Applewood Centers on January 10, 2019 for psychiatric evaluation and management.  (Tr. 697.)  Pat Gabig, RN-LSW, noted that reported anxiety symptoms included crying, tantrums, frustration, feeling overwhelmed, asking a thousand questions, and screaming, kicking, and yelling when things were not under his control.  (*Id*.)  E.A.R.F.'s concentration was also reported to be off, such that he was easily distracted, unable to pay attention, fidgety, impulsive, and sometimes woke in the middle of the night.  (*Id*.)  On examination, Dr. Jahanzeb Khan noted that E.A.R.F. showed poor judgment, poor insight, impaired concentration and was easily distracted, fidgety, and quite impulsive.  (Tr. 700.)  Dr. Khan added a diagnosis of other anxiety disorder in addition to ADHD, and opined "his

symptoms are unstable and meds need to be adjusted today to optimize his treatment."  (Tr. 701.)

Nurse Gabig discontinued Intuniv, started Prozac to treat anxiety and Vyvanse to treat ADHD,

and recommended E.A.R.F. return in a month.  (Tr. 702.)

When E.A.R.F. returned to Dr. Khan on February 7, 2019, Ms. Figueroa reported

medication compliance issues because E.A.R.F. could not swallow capsules, and refused the

medicine when it was mixed into a drink.  (Tr. 703.)  On the days he was able to take the

medication, she reported that there were no side effects but his symptoms were essentially

unchanged from the prior month.  (*Id*.)  She requested medication in gummy or tablet form.  (*Id*.)

On examination, Dr. Khan noted E.A.R.F. was cooperative but very restless, fidgety, and hyper-

active.  (Tr. 704.)  Examination findings also noted poor judgment and insight and impaired

attention/concentration.  (Tr. 705.)  Dr. Khan observed that E.A.R.F. was "making a mess in the

office and running around with lots of energy."  (*Id*.)  He started E.A.R.F. on Tenex for ADHD,

continued Prozac for anxiety but changed to tablets, continued chewable Vyvanse for ADHD but

switched to chewables, and continued melatonin for sleep.  (Tr. 707.)  He recommended

E.A.R.F. follow up in four to six weeks.  (Tr. 708.)

At a follow up appointment on April 4, 2019, Ms. Figueroa reported E.A.R.F. was

"refusing most medications" and "seems worse with change to Tenex instead of Intuniv."  (Tr.

709.)  Dr. Khan indicated Ms. Figueroa wanted to restart Intuniv, and "will no longer give other

meds as he is noncompliant."  (*Id*.)  Dr. Khan discussed with Ms. Figueroa the need to make an

effort to give E.A.R.F. the new medications, because it would otherwise be unclear what

medications would be helpful.  (*Id.*)  Ms. Figueroa reportedly asked for a new doctor, and

E.A.R.F. was scheduled for an appointment with Dr. Brahmaiah Tandra the following week to

discuss an increase in Intuniv.  (*Id*.)

At his initial appointment with Dr. Tandra at Applewood Centers on April 12, 2019, E.A.R.F. presented as "cooperative, bilingual, and appropriately groomed." (Tr. 712.)  On examination, Dr. Tandra noted that E.A.R.F. was "very restless, fidgety, hyper-active," had difficulty following directions, exhibited poor judgment and poor insight, and impaired concentration.  (Tr. 712-13.)  Dr. Tandra also noted E.A.R.F. made a mess in the office while running around with lots of energy.  (Tr. 713.)  Dr. Tundra continued E.A.R.F. on Prozac and Melatonin as previously prescrived, increased his dosage of chewable Vyvanse, and started him on Intuniv at 2 mg per day.  (Tr. 715.)

### 2.  Opinion Evidence

#### i.  State Agency Reviewers

On August 4, 2017, state agency reviewing physician Dr. Obiaghanwa Ugbana reviewed the record and opined that E.A.R.F had a "less than marked" limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for yourself.  (Tr. 72-74.)  Dr. Ugbana also opined E.A.R.F. had no limitations in moving about and manipulating objects and health and physical well-being.  (Tr. 74.)

On November 16 and 17, 2017, state agency reviewing physician Dr. Frank Stroebel and reviewing psychologist Dr. Jennifer Swain reviewed the record and jointly opined that E.A.R.F had a "less than marked" limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, and a "marked" limitation in caring for yourself.  (Tr. 84-86.)  They also opined E.A.R.F. had no limitations in moving about and manipulating objects or health and physical well-being.  (Tr. 85.)

### ii.  Consultative Examination Reports

On June 26, 2017, Dr. Victoria Liao, Psy.D., performed a consultative evaluation of

E.A.R.F., who was then five years and three months old, and the request of the state agency.  (Tr.

568.)  An interpreter was used for the evaluation.  (*Id*.)  Dr. Liao noted that E.A.R.F. did not

have friends, but had a positive relationship with his mom, three-year-old sister and six-month-

old brother.  (Tr. 569.)  His mother reported no cognitive impairments, and no symptoms of

depression, but was anxious when his routine was changed and would hit himself or bang his

head when he got frustrated.  (Tr. 570.)  Dr. Liao noted that E.A.R.F. did not make appropriate

eye contact but was cooperative during his examination.  (*Id*.)  He was casually dressed, with

unremarkable grooming and hygiene.  (*Id*.)  On examination, E.A.R.F. did not use complete

sentences, his speech was difficult to understand, he exhibited spontaneous sounds, and his

expressive and receptive language skills were below others his age.  (*Id*.)  He was unable to say

who or where he was, or what time it was, but was able to respond to his name when called and

point to something red.  (Tr. 571.)  He was unable to count to ten, recite the alphabet, or show

three fingers.  (*Id*.)  He could recall three objects immediately, but none after a few-minute delay

or after being presented with another object.  (*Id*.)  He could count three digits forwards, but not

backwards.  (*Id*.)  Dr. Liao diagnosed E.A.R.F. with language disorder and unspecified

neurodevelopmental disorder, and opined that E.A.R.F. was in the low range of cognitive

functioning, did not exhibit age-appropriate orientation or insight, or fair judgment, and had

deficits with home, health, community, self-care, social, and communication skills.  (*Id*.)  Dr.

Liao opined that E.A.R.F. had limitations the following areas:

- moderate limitation in ability to acquire and use information, attend to and complete tasks, and interact and relate with others; and

- marked limitation in self-care.

(Tr. 572-73.)

On July 31, 2017, Anat Nurko, M.A., CCC-SLP, a bilingual-bicultural speech language pathologist, performed a speech and language consultative examination of E.A.R.F., who was then five years and four months old, at the request of the state agency.  (Tr. 588.)  She noted that E.A.R.F. is bilingual, and his native language is Spanish.  (*Id*.)  Figueroa described E.A.R.F.'s behavior as aggressive and defiant, and reported that he had previously hurt others, but only hurt himself since starting his IEP.  (*Id*.)  Ms. Nurko noted E.A.R.F.'s ADHD diagnosis and that he was not on medication.  (Tr. 590.)  She reported E.A.R.F. presented for the examination with a pacifier, was non-compliant during his examination, and exhibited distracted, defiant, and aggressive behavior throughout, such that testing results may have been unreliable.  (Tr. 590.)  Ms. Nurko had to ask Ms. Figueroa to come into the room to assist with E.A.R.F's behavior, but "he became more defiant in her presence," hit her, screamed, kicked, threw himself on the floor, and cried, refusing to participate  (Tr. 589.)  However, Ms. Nurko noted that E.A.R.F. initiated conversation throughout the examination, stayed on topic, made eye contact, and took turns.  (Tr. 590.)  She opined that E.A.R.F.'s prognosis was good if his behavior improved and he cooperated during therapy.  (Tr. 591.)

### iii.  Teacher's Opinion

E.A.R.F.'s first grade teacher at Clark Elementary School, Anna Lucero, completed a Social Security teacher questionnaire in April 2019.  (Tr. 431.)  The questionnaire required her to check a box indicating whether E.A.R.F. had "no problem," "a slight problem," "and obvious problem," "a serious problem," or "a very serious problem" with certain activities relating to his abilities to: acquire and use information; attend and complete tasks; interact and relate with

13

others; move about and manipulate objects; and care for himself.  (Tr. 431–38.)  Ms. Lucero

indicated she had been teaching E.A.R.F. since August 2018, and that he was in an all-day

inclusion classroom with three adults, including two teachers, and twenty-five total students,

including five students in special education, and 22 students identified as English language

learners.  (Tr. 431-32.)  She identified his "actual grade level" as first grade, and his "current

instructional level as kindergarten for reading and writing, and first grade for math.[1]  (Tr. 431.)

She indicated he did not have an unusual degree of absenteeism.  (*Id*.)

Overall, Ms. Lucero indicated that E.A.R.F. had "an obvious problem" in the domain of

acquiring and using information.  (Tr. 432.)  She also indicated that E.A.R.F. had "an obvious

problem" with most of the components of this domain, with the following exceptions:

- She opined he had "a very serious problem" providing organized oral explanations and adequate descriptions and expressing ideas in written form.

- She opined he had "a serious problem" reading and comprehending written material and understanding and participating in class discussions.

(Tr. 432.)

Overall, Ms. Lucero indicated that E.A.R.F. had "an obvious problem" in the domain of

attending and completing tasks.  (Tr. 433.)  Again, she indicated that E.A.R.F. had "an obvious

problem" with most of the components of this domain, with the following exceptions:

- She opined that E.A.R.F. had "a serious problem" paying attention when spoken to directly, waiting to take turns, and working at a reasonable pace.

- She opined E.A.R.F. had "a slight problem" with sustaining attention during play/sport activities, and carrying out single-step instruction,

(Tr. 433.)

---

[1] On the form it appears Ms. Lucero originally wrote "early first grade" for the math instructional level, and then crossed out the word "early."  (Tr. 431.)

14

Overall, Ms. Lucero indicated that E.A.R.F. had a "serious problem" in the domain of interacting and relating with others.  (Tr. 434.)  She indicated that E.A.R.F. had "a serious problem" in all the check box categories, except that:

- She opined he had "an obvious problem" respecting and obeying adults in authority.

- She opined he had "a slight problem" interpreting the meaning of facial expressions, body language, hints, and sarcasm.

(Tr. 434.)  In the narrative section describing behavior modification strategies, Ms. Lucero explained that E.A.R.F. required "a lot of attention, encouragement, and praise," functioned better in a small group, and needed separation from students in hallway transitions. (*Id*.)  She stated that E.A.R.F. needed a highly structured environment where expectations were known and followed through with, and that he was unable to handle change in routine and procedures "in a mature (7 year old) way."  (*Id*.)

Ms. Lucero opined that E.A.R.F. had "no problem" moving about and manipulating objects, noting he was "very coordinated."  (Tr. 435.)

Ms. Lucero did not provide an overall assessment of E.A.R.F.'s ability to care for himself, but indicated that E.A.R.F. had "a very serious problem" in the following areas:

- handling frustration appropriately;

- being patient when necessary;

- taking care of personal hygiene;

- using good judgment regarding personal safety;

- identifying and appropriately asserting emotional needs; and

- using appropriate coping skills to meet daily demands.

(Tr. 436.)  Ms. Lucero also opined that E.A.R.F.  had "an obvious problem" responding appropriately to changes in his own mood, and "a slight problem" knowing when to ask for help. *(Id.)*  She explained that she had no basis to assess his ability to care for his physical needs or cooperate in taking needed medications.  (*Id*.)

Finally, Ms. Lucero wrote that E.A.R.F. takes medication, after which he is able to focus better and manage himself better.  (Tr. 437.)

**3.      Hearing Testimony**

Both Ms. Figueroa[2] and E.A.R.F. testified at the May 1, 2019 hearing.  During Ms. Figueroa's testimony, E.A.R.F. waited outside with Ms. Figueroa's sister.  (Tr. 45.)

### i.  Plaintiff's Testimony

Ms. Figueroa testified that E.A.R.F. is seven years old, and the oldest of three children. (Tr. 53.)  While E.A.R.F. played with his two-year-old brother, they always ended up fighting because his brother took his toys, which frustrated him.  (*Id*.)  He fought with his six-year-old sister all the time, accusing her of copying him and wanting his things.  (*Id*.)  He called his mother by her first name and was very demanding towards her.  (Tr. 54.)  He had no male role models in his life.  (*Id*.)

E.A.R.F. started off the year doing badly at school, then his work improved.  (*Id*.) However, in the last few months he had been doing really badly.  (*Id*.)  He refused to sit, and would not listen to what he was told.  (Tr. 54-55.)  Ms. Figueroa thought a medication change might improve his behavior at school, but it did not.  (Tr. 55.)  A week prior, she reported they had switched back to the previous medication.  (*Id*.)  The teacher has called her to pick him up in

---

[2] Ms. Figueroa is identified in the transcript as Ms. Santiago.

the middle of the day about three weeks ago, because he was not controlling himself and was crawling under the table.  (Tr. 56.)  He had never gotten into physical fights with children at school.  (Tr. 57.)  He received speech therapy and occupational therapy at school.  (Tr. 58.)  He had never been suspended.  (Tr. 60.)  When teachers could not control his behavior, they either sent him to his psychologist or called Ms. Figueroa.  (*Id.*)

With regard to his academic performance, Ms. Figueroa was not sure how his grades were, but she thought he had gone down in some of them.  (*Id.*)  The last time she got a grade report, E.A.R.F.'s grades were low, except for physical education.  (Tr. 58.)  His worst subjects were science and social studies.  (*Id.*)

With regard to his behavior at home, E.A.R.F. was very demanding when Ms. Figueroa picked him up from school.  (*Id.*)  He would throw his things and demand food.  (Tr. 56.)  If she did not allow him to do what he wanted, he would start kicking and throwing things.  (Tr. 57.)  He had dented the walls by kicking them.  (*Id.*)  He had lifted his hand to hit her, but she restrained him and did not allow it.  (*Id.*)  He never got into physical fights with his sister or brother.  (*Id.*)  He was also very anxious at home, told Ms. Figueroa he was depressed, and cried a lot.  (Tr. 59.)

### ii.  Child's Testimony

E.A.R.F. testified that he was seven years old and in first grade.  (Tr. 61.)  School was good, and math was his favorite subject.  (*Id.*)  Nothing in school was hard.  (*Id.*)  He got along well with his brother, and they played basketball, tag, or hide and seek.  (*Id.*)  He also got along well with his sister, but sometimes his mom yelled at him.  (Tr. 62.)  His favorite thing to do was play on the playground at school, especially on the slide.  (Tr. 63.)

### III. Standard for Disability

To qualify for SSI benefits, "[a]n individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).  To qualify, a child recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

Social Security regulations prescribe a three-step sequential process to evaluate children's disability claims. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To make the step three determination that a child "meets" a listing, the child's impairment must be substantiated by medical findings shown or described in the listing for that impairment. 20 C.F.R. § 416.925(d).  Alternately, to make a step three determination that a child "medically equals" a listing, the child's impairment must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R. § 416.926(a).  Finally, to make a step three determination that a child "functionally equals" a listing, the impairment must be found to be "of listing-level severity," meaning that it will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).  The relevant six domains of functioning to be considered are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating

18

with others; (4) moving about and manipulating objects; (5) caring for herself/himself; and (6)

health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).

## IV. The ALJ's Decision

In her June 28, 2019, decision the ALJ made the following findings:[3]

1. The claimant was born in 2012. Therefore, he was a preschooler on April 19, 2017, the date application was filed, and is currently a school-age child)).

2. The claimant has not engaged in substantial gainful activity since April 19, 2017, the application date.

3. The claimant has the following severe impairments: attention deficit hyperactivity disorder, speech and language impairment, anxiety disorder, and oppositional defiant disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.

6. The claimant has not been disabled, as defined in the Social Security Act, since April 19, 2017, the date the application was filed.

(Tr. 24-38.)  Based on the foregoing, the ALJ determined that E.A.R.F. had not been under

a disability, as defined in the Social Security Act, from April 19, 2017, through the date

of the decision.  (Tr. 38.)

## V. Plaintiff's Arguments

Ms. Figueroa argues that the ALJ erred in determining that E.A.R.F. did not have

at least two marked limitations, as needed to satisfy Listing 112.11 or functionally equal the

Listings.  (ECF Doc. 16 p. 1.)  She notes that the ALJ already found one marked limitation, in

---

[3] The ALJ's findings are summarized.

19

the categories relating to his ability to care for himself, and argues the ALJ failed to consider the record as a whole and lacked substantial evidence when she held that E.A.R.F. did not have at least one additional marked limitation.  (*Id*. pp. 8-9.)  Further, with respect to Listing 112.11 specifically, Ms. Figueroa argues that the ALJ erred in finding Ms. Figueroa had failed to show medical documentation that E.A.R.F. met the first element of that Listing.  (*Id.* p. 12.)

## VI. Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions unless it determines that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakely*, 581 F.3d at 406.   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakely*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakely*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d 647, 654 ("Generally, … we review decisions of administrative agencies for harmless error.").  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Whether Substantial Evidence Supported ALJ's Decision Not to Identify Additional Marked Limitations for Meets Listing and/or Functionally Equals Listing Analyses**

Ms. Figueroa's single assignment of error is that the ALJ lacked substantial evidence to support her finding that E.A.R.F. had marked limitations only in the parallel functional categories "adapting or managing self" and "caring for self," but no marked limitations in any other functional categories.  First, in support of an argument that E.A.R.F. meets Listing

112.11(B), she contends that the complete record requires a finding that E.A.R.F. had marked limitations in one or more of the following three categories: (1) understanding, remembering, or applying information; (2) interacting with others; and (3) concentrating, persisting, or maintaining pace.  (ECF Doc. 16, pp. 8-13.)  Without raising a separate assignment of error, she contends the ALJ also erred in finding a lack of medical documentation that E.A.R.F. met the first element of the listing, Listing 112.11(A).  (*Id.* p. 8.)  Second, in the context of an argument that E.A.R.F. functionally equals the listings, she argues that the complete record requires a finding that E.A.R.F. had marked limitations in one or more of the following three categories: (1) acquiring and using information; (2) attending and completing tasks; and (3) interacting and relating with others.  (*Id.* p. 13-18.)  Each of these arguments will be addressed in turn.

### 1. Whether ALJ Erred in Finding E.A.R.F. Did Not Meet Listing 112.11

To support a finding that E.A.R.F. met Listing 112.11 for "Neurodevelopmental disorders," the following (A) and (B) elements must <u>both</u> be satisfied:

A. Medical documentation of the requirements of paragraph 1, 2, or 3:

1. One or both of the following:

a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or

b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor").

2. Significant difficulties learning and using academic skills; or

3. Recurrent motor movement or vocalization.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 112.00F):

1. Understand, remember, or apply information (see 112.00E1).

    2. Interact with others (see 112.00E2).

    3. Concentrate, persist, or maintain pace (see 112.00E3).

    4. Adapt or manage oneself (see 112.00E4).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Section 112.11.  Because Ms. Figueroa argues the ALJ

erred with respect to both the (A) and (B) findings, both elements are addressed below.

       **i.**     **Listing 112.11(A)**

    As an initial matter, Ms. Figueroa asserts that the ALJ erred in finding that E.A.R.F. did

not show medical documentation to support a finding that he meets part A of Listing 112.11.

(ECF Doc. 16, p. 12.)  With respect to Listing 112.11(A), the ALJ found:

> [t]he record, discussed in detail below, <u>fails to show medical documentation</u> of 1)
> one or both of the following: frequent distractibility, difficulty sustaining attention,
> and difficulty organizing tasks; or hyperactive and impulsive behavior; 2)
> significant difficulties learning and using academic skills; or 3) recurrent motor
> movement or vocalization.

(Tr. 25 (emphasis added).)  The Commissioner argues that substantial evidence supports the

finding that E.A.R.F. did not meet Listing 112.11(A), first because Ms. Figueroa "points

primarily to school records" which are not "medical documentation" in support of the proposed

finding, and second because the ALJ properly weighed evidence both supportive of and

contradictory to the required finding.  (ECF Doc. 18, pp. 6-7.)

    With respect to the Commissioner's first argument, it is undisputed that courts have

found the "medical documentation" required under Listing 112.11(A) to be lacking when the

only records cited are school and educational records.  *See Mitchell v. Berryhill*, No. 3-14-1108,

2017 WL 1131742, *4 (M.D. Tenn. Mar. 27, 2017); *Howard v. Comm'r of Soc. Sec. Admin.*, No.

1:18-CV-10522, 2019 WL 4281971, at *5 (E.D. Mich. Aug. 14, 2019) ("[T]o the extent Plaintiff

cites to school or educational records in support of meeting Part A of Listing 112.11, he fails to

satisfy his burden."), *report and recommendation adopted sub nom. Howard v. Comm'r of Soc. Sec.*, No. 18-10522, 2019 WL 4278046 (E.D. Mich. Sept. 10, 2019).

Ms. Figueroa responds that the evidence in this case is not limited to education records, but also includes medical records that are relevant to the part A determination. (ECF Doc. 19, p. 1.) The question thus becomes whether medical documentation in the record is consistent with the ALJ's finding that "the record … <u>fails to show</u> medical documentation" of the elements outlined in 112.11(A) (Tr. 25 (emphasis added)), under a substantial evidence standard.

It is not difficult to locate medical documentation in the record that is consistent with "[f]requent distractibility, difficulty sustaining attention, and difficulty organizing tasks" and "[h]yperactive and impulsive behavior," as set forth in Listing 112.11(A)(1)(a) and (A)(1)(b). *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Section 112.11(A)(1)(a)-(b). For example, mental status examination findings from Certified Nurse Practitioner Leslie Thomas on October 13, 2017 and December 4, 2017 reflect that E.A.R.F. demonstrated decreased impulse control, decreased frustration tolerance, impaired judgment, reduced eye contact, hyperactivity, and impaired concentration. (Tr. 617, 652.) A psychiatric diagnostic evaluation by Stephanie Flynn, CT, co-signed by supervisor Robin Leightman, Ph.D., LPCC, in January 2019 noted an inability to focus on any single activity and a blunted affect, with no facial expressions, even when asked specific questions. (Tr. 691, 694.) In an evaluation and management office visit with Jahanzeb Khan, M.D. in January 2019, Dr. Khan observed poor insight and judgment and impaired concentration, described more specifically as "easily distracted, fidgety, and quite impulsive in the office." (Tr. 700.) A month later, Dr. Khan observed that E.A.R.F. was "very restless, fidgety, and hyper-active," with continued poor insight/judgment and impaired concentration, now described as "making a mess in the office and running around with lots of energy." (Tr.

705.)  When E.A.R.F. established care with new provider Brahmaiah Tandra, M.D. in April

2019, Dr. Tandra observed that he was "very restless, fidgety, and hyper-active" and found it

"[d]ifficult to follow the directions," with continued findings of poor insight/judgment and

impaired attention/ concentration (Tr. 712.)

> The Commissioner observes that the ALJ acknowledged documentation showing some of
the findings detailed above in her decision (ECF Doc. 18, p. 9 (citing Tr. 26)), and points out that
the ALJ also documented more normal objective findings and evidence of improvement with
medication (*Id.* (citing Tr. 25)).  If the question was whether the ALJ properly weighed evidence
relating to the severity of an impairment, this sort of balancing argument might be well taken.
But here, for part A of the Listing, the question is simply whether substantial evidence supports
the ALJ's finding that the record "fails to show" medical documentation of the symptoms and
behaviors identified in the listing.  As discussed above, the record clearly shows medical
documentation of the elements outlined in Listing 112.11(A)(1)(a)-(b), such that the ALJ's
finding to the contrary is not supported by substantial evidence.

### ii.    Listing 112.11(B)

> Even if the ALJ committed error in finding that the elements of part A of Listing 112.11
were not met, that does not necessitate a finding that the ALJ erred in her ultimate finding
E.A.R.F. does not meet Listing 112.11.  In order to support a finding that Listing 112.11 has
been met in this case, it must also be established that part B of the Listing has been met.  To meet
part B, it must be found that E.A.R.F. had an "extreme" limitation of one, or a "marked"
limitation of two, of the four areas of mental functioning, including: (1) Understanding,
remembering, or applying information; (2) Interacting with others; (3) Concentrating, persisting,
or maintaining pace; and (4) Adapting or managing oneself.  20 C.F.R. § Pt. 404, Subpt. P, App.

1, Section 112.11(B).  A "marked" limitation is more than moderate but less than extreme, and is
a limitation that seriously interferes with functioning.  20 C.F.R. § 416.926a(e)(2)(i).  "It is the
equivalent of the functioning we would expect to find on standardized testing with scores that are
at least two, but less than three, standard deviations below the mean."  *Id.*

Here, the ALJ concluded that: "the record fails to show the claimant with one extreme or
two marked limitations in the following areas a mental functioning: understanding,
remembering, or applying information; interacting with others; concentrating, persisting, or
maintaining pace; and adapting or managing oneself."  (Tr. 25.)  More specifically, she held that
that E.A.R.F. had a "marked" limitation in the category of "adapting or managing himself," but
had only "moderate" limitations in the other three categories.  (Tr. 25-27.)  Ms. Figueroa argues
that the record requires a finding that E.A.R.F. also had "marked" limitations in at least one of
the three remaining categories.  (ECF Doc. 16, p. 12.)  In support, she contends that the ALJ
misstated evidence regarding E.A.R.F.'s classroom placement and failed to properly consider the
April 2019 evaluation of E.A.R.F.'s first grade teacher.  (*Id.* p. 9; ECF Doc. 19, p. 2.)

The ALJ's decision contains a broad discussion of record evidence relating to each of the
four functional categories at issue, although it is noted that the supporting citations often refer to
exhibits without specific page references, making it more difficult to identify the specific basis
for each finding.  (*See* Tr. 25-27.)  Upon comparison of the ALJ's findings to the underlying
evidence, it is evident that Ms. Figueroa's concerns regarding the discussion of the April 2019
questionnaire from first-grade teacher Ms. Lucero are well founded.   Although the ALJ's factual
findings are detailed as a general matter, a closer review of the evidence reveals a repeated
neglect to acknowledge portions of Ms. Lucero's questionnaire responses that may conflict with
the ALJ's findings the E.A.R.F. had only a "moderate" level of limitation.

26

First, in support of her finding that E.A.R.F. had "moderate" limitations in the category of understanding, remembering, or applying information, the ALJ noted that E.A.R.F. remained in a "general education classroom" pursuant to the terms of his 2017-18 IEP, and worked at grade level in math once in first grade, although he remained below grade level in reading and writing.  (Tr. 25.)  Although the ALJ specifically referenced Ms. Lucero's teacher questionnaire in making these findings, she omitted certain other information provided in the questionnaire, including Ms. Lucero's observation that E.A.R.F. was in an "all day inclusion classroom" "with 3 adults (2 teachers) in the classroom," where the classroom was "made up of 5 students in Special Education, 25 total students – 22 students are considered English Language Learners." (Tr. 431-32.)  The information regarding his modified classroom appears to be in conflict with the ALJ's statement that E.A.R.F. was in a "general education classroom" as of 2017-18.  The ALJ's findings in this section also omitted any mention of the teacher's stated opinion that E.A.R.F. had an "obvious" level of impairment overall in acquiring and using information, with several "serious" and "very serious" problems within the category.  (Tr. 432.)

Second, in the category of interacting with others, the ALJ found "moderate" limitations based on a discussion of various findings and observations regarding E.A.R.F.'s ability to interact with others, including his teacher's reported statements that he "functioned better in a small group" and "had a problem playing cooperatively with other children."  (Tr. 26.)  While the ALJ's description of the teacher's findings was not inaccurate *per se*, it was misleading because it omitted some of Ms. Lucero's significant observations and glossed over the full extent and severity of her findings.  For example, not only did Ms. Lucero opine that E.A.R.F. had "a problem playing cooperatively with others" (one of thirteen categories discussed in this section of the questionnaire), she actually found that E.A.R.F. had a "serious problem" in the majority

27

(eleven) of the thirteen listed categories and a "serious problem" overall in interacting and relating with others.  (Tr. 434.)  Further, in addition to reporting that E.A.R.F. functioned better in a small group, she also reported that he "need[ed] a lot of attention and praise," required "[s]eparation from students in Hallway transitions," was "[u]nable to handle change in routines and procedures in a mature (7 year old) way," and needed a "highly structured environment, where expectations [we]re known and follow [sic] through with."  (*Id.*)

Third, in the category of concentrating, persisting, and maintaining pace, the ALJ found "moderate limitations" based on a discussion of objective findings and treatments relating to E.A.R.F.'s impairments, including Ms. Lucero's report that he had problems carrying out multi-step instructions and refocusing, but only a slight problem in sustaining attention and carrying out single step instructions.  (Tr. 26.)  More accurately, Ms. Lucero opined that E.A.R.F. had an "obvious" problem with attending and completing tasks overall, and with eight of the thirteen total categories in this section, but also "serious" problems with paying attention when spoken to, waiting to take turns, and working at a reasonable pace/finishing on time.  (Tr. 433.)

Fourth, in the category of caring for himself, the ALJ found "marked" limitations based on evidence that included Ms. Lucero's opinion that E.A.R.F. "has a serious problem handling frustration appropriately, being patient when necessary, and using appropriate coping skills." (Tr. 26-27.)  The ALJ's finding here is consistent with Ms. Lucero's broader observations in the questionnaire that E.A.R.F. had "serious" limitations in six out of ten subcategories in that section.  (Tr. 436.)  Notably, this is the only section where the ALJ specifically referenced Ms. Lucero's opinion as to the <u>severity</u> of a problem, citing her report of "serious" problems to support a finding of "marked" limitations.  (Tr. 27 (citing Tr. 436).)  In contrast, the ALJ mentioned only a "problem," without reference to any reported severity, in finding E.A.R.F. had

28

"moderate" limitations in interacting with others, even though Ms. Lucero had opined that his problems in this area were "serious" overall and in 11/13 subcategories (Tr. 27 (citing Tr. 434).)

It is noteworthy, but not dispositive in this case, that the ALJ did not separately discuss Ms. Lucero's opinion or the weight given to her findings at any point in the decision.  (*See* Tr. 28 (discussing consideration of observations and opinions of E.A.R.F.'s mother), Tr. 29-30 (discussing weight given to opinion testimony of state agency consultants and consultative examiners).  Under the Social Security Administration's ("SSA") new regulations for evaluating opinion evidence,[4] Ms. Lucero's questionnaire responses are classified as evidence from a "non-medical source," 20 C.F.R. § 416.913(a)(4), which are not subject to the new articulation requirements for medical opinions, 20 C.F.R. § 416.920c(d).  Nevertheless, Social Security Ruling (SSR) 09-2P continues to provide:

> Evidence from other sources who are not medical sources and who know and have contact with the child can also be very important to our understanding of the severity of a child's impairment(s) and how it affects day-to-day functioning. These sources include parents and caregivers, educational personnel (for example, teachers, early intervention team members, counselors, developmental center workers, and daycare center workers), public and private social welfare agency personnel, and others (for example, siblings, friends, neighbors, and clergy). Therefore, we will consider evidence from such non-medical sources when we determine the severity of the child's impairment(s) and how the child typically functions compared to children of the same age who do not have impairments.
>
> *Soc. Sec. Ruling, SSR 09-2p.; Title XVI: Determining Childhood Disability-Documenting A Child's Impairment-Related Limitations,* SSR 09-2P (S.S.A. Feb. 18, 2009) (emphasis added).

As E.A.R.F.'s classroom teacher at the time of his hearing, and a provider of direct personal observations of his day-to-day functioning, Ms. Lucero's non-medical observations and opinions were of direct relevance to the determination made in this case.

---

[4] The new regulations apply to claims filed after March 27, 2017, such as the claim in this case.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules),* 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.

The Sixth Circuit has made it clear that a failure to consider the record as a whole undermines an ALJ's decision. *See Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985).  An ALJ cannot simply "pick and choose" evidence in the record, "relying on some and ignoring others, without offering some rationale for his decision."  *Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004).  Stated another way, an ALJ may not "cherry pick[] select portions of the medical record" to support her findings, but must instead perform "a proper analysis of the medical evidence under agency regulations and controlling case law."  *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013); *see also Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where ALJ was "selective in parsing the various medical reports"); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("[A]n ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'").

Moreover, the Commissioner's reasoning must "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877; *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).  Where an ALJ's stated reasons for making a determination are inaccurate, it has repeatedly been held that the ALJ failed to build an accurate and logical bridge between the evidence and the result.  *See, e.g., Stemple v. Kijakazi*, No. 1:20-CV-485, 2021 WL 4060411, at *8 (N.D. Ohio Sept. 7, 2021) (inaccurate description of opinion's findings); *Morandy v. Comm'r of Soc. Sec.*, No. 2:19-CV-13464, 2021 WL 925227, at *5 (E.D.

Mich. Feb. 22, 2021) (inaccurate description of opinion), *report and recommendation adopted*, No. 2:19-CV-13464, 2021 WL 915540 (E.D. Mich. Mar. 10, 2021); *Muhammad v. Comm'r of Soc. Sec.*, No. 1:16-CV-2569, 2017 WL 4872668, at *9 (N.D. Ohio Oct. 10, 2017) (inaccurate reasons for discrediting medical findings), *report and recommendation adopted*, No. 1:16-CV-2569, 2017 WL 4844042 (N.D. Ohio Oct. 26, 2017); *Moxley v. Comm'r of Soc. Sec.*, No. 1:15CV1533, 2016 WL 2338205, at *14 (N.D. Ohio Apr. 15, 2016) (inaccurate explanation for finding lack of credibility), *report and recommendation adopted*, No. 1:15CV1533, 2016 WL 1733458 (N.D. Ohio Apr. 29, 2016).

In this case, a review of the record reveals that the ALJ's discussion of Ms. Lucero's questionnaire findings was improperly selective, relying on some findings while ignoring or downplaying others without offering a rationale, with the ultimate result of misstating the true findings and observations set forth by Ms. Lucero.  Because the ALJ failed to discuss the omitted findings, and thus failed to provide any reasoning for discounting those findings, the undersigned must conclude that her resulting findings of "moderate" limitations in all three remaining functional categories are not supported by substantial evidence.  *See Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724-25 (6th Cir. 2014) (reversing ALJ decision when the ALJ's reasoning showed that she "discounted the severity of [the claimant's] conditions … by failing to address certain portions of the record").

Further, given that the ALJ's findings as to E.A.R.F.'s level of limitation were based in part on an inaccurate description of evidence, resulting from the omission / mischaracterization of certain findings, it is further evident that the ALJ has failed to build an "accurate and logical bridge" between the evidence and her findings.  *Fleischer*, 774 F. Supp. 2d at 877.

31

Accordingly, the undersigned recommends that the case be remanded for a full and accurate explanation of the evidence that forms the basis for the ALJ's findings regarding: (1) whether the elements of Listing 112.11(A) have been met; and (2) E.A.R.F.'s level of limitation in each of the four functional categories set forth in Listing 112.11(B).  To the extent that the ALJ relies on the April 8, 2019 teacher questionnaire from Anna M. Lucero, the discussion of that evidence should accurately account for the findings set forth therein.

### 2. Whether ALJ Erred in Finding in Finding E.A.R.F. Did Not Functionally Equal the Listings

To support a step three determination that a E.A.R.F. functionally equaled the listings, it must be found that the impairment is "of listing-level severity," meaning that it will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).  The six domains of functioning to be considered are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself/himself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).  Under Social Security's regulations, this evaluation will include asking "for information from your parents and teachers, and … from others who see you often and can describe your functioning at home, in childcare, at school, and in your community."  20 C.F.R. § 416.926a(b)(3).

Similar to the Listing 112.11 argument above, Ms. Lucero argues that the ALJ erred in finding "marked" limitations only in the category of "caring for self," and not in the additional three categories of acquiring and using information, attending and completing tasks, and interacting and relating to others.  (ECF Doc. 16, p. 14.)  In ruling on Ms. Figueroa's argument

that E.A.R.F. "functionally equaled" the listings, the ALJ held that he had less-than-marked

limitations in the categories of acquiring and using information, attending and completing tasks,

interacting and relating with others, moving about and manipulating objects, and health and

physical well-being, and marked limitations in caring for yourself.  (Tr. 30-38.)

     The ALJ's evidentiary findings in support of her "less-than-marked" findings for

acquiring and using information, attending and completing tasks, interacting and relating with

others were similar to her findings in the largely parallel categories from the above analysis.  For

acquiring and using information, the ALJ described E.A.R.F.'s participation in a "general

education classroom" and work at grade level in math, without discussion of elements of the

teacher questionnaire that placed him in a accommodated classroom setting with largely

"obvious" limitations evidenced in this category.  (*See* Tr. 31-32, 432.)  For attending and

completing tasks, the ALJ noted "problems" of an unspecified severity with multi-step

instructions and refocusing, without recognizing that two problems identified were among eight

"obvious" problems identified in this category, with three additional "serious" problems not

identified in the decision.  (*See* Tr. 33, 433.)  For interacting or relating with others, the ALJ

noted that Ms. Lucero reported that he had a "problem" of unspecified severity with playing

cooperatively and functioned better in a small group, without recognizing that Ms. Lucero

reported "serious" problems in eleven of thirteen available subcategories (not simply playing

cooperatively) and opined that E.A.R.F. needed a lot of attention, encouragement, and praise,

had to be separated from others in hallway transitions, needed a highly structured environment,

and was unable to handle changes in an age-appropriate way.  (*See* Tr. 34, 434.)  For caring for

self, the ALJ accurately described Ms. Lucero's report of "serious" problems in this category,

and found E.A.R.F.'s relevant limitations to be "marked."  (*See* Tr. 37, 436.)

Consistent with the findings in the prior section, the undersigned finds that the ALJ misstated Ms. Lucero's questionnaire findings through a combination of omissions and selective citations, failed to provide her reasoning for the omissions, and accordingly failed to support her findings of "moderate" limitations in the three specified functional categories with substantial evidence, and failed to build a logical bridge between the evidence and her conclusions.  *See Gentry*, 741 F.3d at 724-25; *Fleischer*, 774 F. Supp. 2d at 877.

Accordingly, the undersigned recommends that the case be remanded for a full and accurate explanation of the evidence that forms the basis for the ALJ's findings regarding E.A.R.F.'s level of limitation in each of the six functional categories required to functionally equal the listings under 20 C.F.R. § 416.926a.  To the extent that the ALJ relies on the April 8, 2019 teacher questionnaire from Anna M. Lucero, the discussion of that evidence should accurately account for the findings set forth therein.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED** for further proceedings consistent with this Report and Recommendation.  On remand, the ALJ should provide a full and accurate explanation of the evidence that forms the basis for the ALJ's findings regarding: (1) whether the elements of Listing 112.11(A) have been met; (2) the level of limitation in each of the four functional categories set forth in Listing 112.11(B); and (3) the level of limitation in

each of the six functional categories required to functionally equal the listings under 20 C.F.R. § 416.926a.

December 13, 2021

/s/Amanda M. Knapp

_____
AMANDA M. KNAPP
United States Magistrate Judge


## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).